CASE 83.—ACTION BY GEORGE FREPPON AGAINST THE LOUISVILLE & NASHVILLE RAILROAD COMPANY. —Oct. 1, 1909.

## L. & N. R. R. Co. v. Freppon

Appeal from Henderson Circuit Court.

J. W. HENSON, Circuit Judge.

Judgment for plaintiff, defendant appeals.—Affirmed.

1. Railroads—Defective Appliances—Injuries to Third Persons— Knowledge of Defect.—Where the servant of a consignee of a car load of coke was injured by the fall of a defective car door as he attempted to open the car to unload it, the petition was not objectionable for failure to allege that the railroad company knew, or by ordinary care could have known, of the defect, and that plaintiff did not know thereof, and by ordinary care could not have known it, since it is only in actions by a servant against his master to recover for the master's negligence that it is necessary to aver knowledge on the master's part and want of knowledge by the servant.

2. Railroads—Unsafe Appliances—Injuries to Third Persons—Duty of Railroads.—Plaintiff, the servant of a consignee of a car load of coke, was injured while attempting to open the door of the car after it had been placed on the consignee's switch for unloading, by the fall of the car door, which was defective upon him. The car was owned and used by the railroad company, and the consignee had nothing to do with it except to unload it. It also appeared that at the time the car was placed the railroad company had knowledge of the defect. Held, that the railroad company was bound to keep its cars in a reasonably safe condition, and was therefore liable to plaintiff for his injuries while exercising ordinary care in unloading it.

3. Railroads—Defective Appliances—Injuries to Third Person—Contributory Negligence.—Where plaintiff, the servant of a consignee of a car load of coke, was injured by the fall of the car door on him as he attempted to open it to unload the car, and it did not appear that he knew or had reasonable grounds to believe that the door would fall when he knocked out the pin which held it, whether plaintiff himself was negligent was for the jury.

4. Damages—Excessiveness—Personal Injuries.—While plaintiff sustained serious and painful injuries resulting from the fall of a defective car door on him, and the only physician examined testified that his ability to labor, though not totally destroyed, was permanently impaired, and that his injured limb would never be as good as it was before the injury, a verdict for $2,700 was not excessive.

YEAMAN & YEAMAN, BENJAMIN D. WARFIELD and CHAS. H. MOORMAN for appellant.

MONTGOMERY MERRITT and W. P. McCLAIN for appellee. No briefs in the record.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant company delivered to the Henderson Tobacco Extract Company at its factory one of its cars loaded with coke. The car was loaded at a mine on the line of the railroad company, and carried from there by it on its line of railroad to Henderson, its

destination, and was placed by it on a switch owned by the railroad company that ran from the line of the railroad to the factory to be unloaded. A short while after the car was placed at the factory the appellee, Freppon, an employe of the extract company, in attempting to open the car door for the purpose of getting the coke out, was severely injured by the falling of the door upon him. To recover damages for the injuries thus sustained he brought this action, and the jury assessed the damages at $2,700. The company in asking a reversal of the judgment entered upon the verdict insist, first, that the petition was defective; second, that the injuries were the result of his own negligence; and, third, that the recovery was excessive.

It is argued that the petition is defective because it fails to aver (1) that the company knew of the defect in the car door, or by the exercise of ordinary care could have known it; (2) that Freppon did not know of the defect, and by the exercise of ordinary care could not have known it; and (3) because it does not contain any averment showing that the company owed a duty to Freppon that would make it liable to respond in damages to him for any injuries received.

The action is not based upon the assumption that the relation of master and servant existed between the company and Freppon, but proceeds on the theory that the railroad company was under a duty to have the car in reasonably safe condition, and that he was injured by its negligence in having and permitting the door of the car to be and remain out of repair and in a dangerous condition. It is only in actions by a servant against his master to recover damages growing out of negligence in respect to the

failure of the master to perform some duty owing
to the servant that it is necessary to aver that the
master knew, or by the exercise of ordinary care
could have known, of the defects in the appliances
or premises that caused the injury, and that the ser-
vant did not know, and could not by the exercise of
ordinary care have known, of such defects.  The ne-
cessity for an averment like this in actions by the
servant against the master grows out of the fact that,
generally speaking, the servant assumes the ordinary
risks of the employment, and can not maintain an ac-
tion for injuries sustained by a breach of a duty on
the part of the master, unless the master knew, or
by the exercise of ordinary care could have known,
of the unsafe appliances or place that brought about
the injury, and the servant did not know and by the
exercise of ordinary care could not have discovered
the danger.  But Freppon was not a servant of the
railroad company; and so it is not necessary to fur-
ther consider this phase of the argument of counsel,
or the line of authorities fixing and defining the rela-
tive duties of master and servant.  As the rule of
pleading noticed has no  application  to  an  action
brought by a person not a servant, and there is no
other reason for holding the petition defective, it
must be held to state a good cause of action.

It is, however, earnestly insisted that the company
owed no duty whatever to Freppon, and therefore was
not responsible to him in damages for an injury sus-
tained by reason of the defective condition of its car,
however negligent it may have been in failing to dis-
cover and repair the defect. This argument is put by
counsel upon the ground that Freppon at the time he
was injured was not in the employment of the railroad
company or performing any service for it, but was

an employe of the extract company, to which the car had been delivered for the purpose of unloading; and that, as there was no contractual relation existing between Freppon and the railroad company, it was under no obligation to furnish him safe appliances or a safe place in which to work for the extract company. This feature of the case presents an interesting legal question that in the light of the authorities we will endeavor to dispose of in harmony with the principles of law prevailing in this state and applicable to the matter in hand. In order that there may be no confusion or misunderstanding as to the issue, we will state the pertinent facts concerning which there appears to be no conflict in the testimony.

First. The car by which Freppon was injured was owned and used by the railroad company, and was placed by it on the switch only for the purpose of being unloaded.

Second. The extract company had no control over the disposition or movement of the car, or anything to do with it, except to unload it at the place where it was placed by the railroad company.

Third. Freppon was not in any capacity a servant of the railroad company. He was an employe of the extract company, and as such undertook for it to assist in unloading the car.

Fourth. The car door that fell upon him was in an unsafe and dangerous condition when it was placed at the unloading point by the railroad company, and its defective condition was at that time known to the employes of the railroad company.

So that upon these facts, the question may be thus stated: Is a common carrier under a duty to maintain its cars in a reasonably safe condition when they have

been placed by it in the course of its business at a point for the purpose of being loaded or unloaded, and therefore liable to respond in damages for a failure to perform this duty to a person not an employe of the railroad company, but who is engaged in loading or unloading the car as the servant of the person for whose use the car has been so placed? Or is the common carrier when it places the car at the disposal of the consignee or consignor for the purpose of being unloaded or loaded relieved from all obligation to have the car at the time it is so placed in a reasonably safe condition for the purpose for which it is to be used, and free from liability for injuries received by the consignee or consignor or their servants while loading or unloading the car? If the railroad company owed no duty to Freppon under the circumstances stated, it is plain that the verdict in his behalf should be set aside and the action dismissed but we do not agree with counsel for the railroad company that a common carrier is relieved from the obligation of keeping its cars reasonably safe during the time they are being loaded or unloaded merely because during such time they are under the control of the persons loading or unloading them, at least in so far as it may be necessary to perform this service. When a carrier delivers a car to a consignor to be loaded, or a consignee to be unloaded, it must have the car in a reasonably safe condition for the purpose for which it is intended to be used. In the absence of an express agreement, the law will raise an implied contract to this effect, and, under and by virtue of this implied contract, a recovery for a breach of it may be had by any person injured while engaged in loading or unloading the car and exercising ordinary care for his own safety.

The duties and obligations of a common carrier to the public are not suspended during the time that its cars are being used by its patrons for purposes of loading or unloading. When it delivers a car for this purpose and invites its customers to use it, it undertakes that the car is in a reasonably safe condition to be used for the purpose intended. There is no sort of doubt about the proposition that a carrier must keep its depot grounds and premises in reasonably safe condition for use by persons having business at such places with it; and that its failure to keep them in such condition is actionable negligence for which it may be required to respond in damages to any person injured on account of such failure. This duty and corresponding liability is based upon the doctrine that, as the carrier invites the public to use its stations and platforms and premises thereabouts, it must keep them in a reasonably safe condition for use by the persons it has thus invited. Hutchinson on Carriers, Sec. 928; 2 Sherman & Redfield on the Law of Negligence, Sec. 410.

And there seems to be no sound distinction between its duty in these respects and its duty to persons to whom it furnishes cars in the course of its business for the purpose of being loaded or unloaded. Its obligation to keep its station platforms and approaches in a reasonably safe condition for use by persons lawfully enjoying them by its invitation is no greater than its duty to keep a car in a reasonably safe condition that it furnishes to a shipper and invites him to use. In each instance the person using the premises or appliances furnished to him by the carrier for the purpose of enabling him to transact business with it has a right to assume that the premises and appliances so furnished will be reasonably safe for his

use.  It would be a distinction without a difference to hold that a carrier must keep its depot platform reasonably safe for use by persons getting on and off its trains, and yet that it might deliver to a shipper for the purpose of being loaded or unloaded a car that was in an unsafe and dangerous condition. When the railroad company placed the car on the switch for the purpose of being unloaded by the employes of the extract company, these employes while so engaged were neither trespassers nor licensees. They were at least impliedly invited by the railroad company to engage in unloading the car it had placed there for that purpose to be unloaded by them.

As said in 3 Elliott on Railroads, Sec. 1248; "One who comes upon the premises of a railroad company in the usual course of business with it for the purpose of loading or unloading, or delivering and receiving freight, is not a mere licensee, but is entitled to the care due one who is invited to come upon the premises of another."

In Southern Railway Company in Kentucky v. Goddard, 121 Ky. 567, 89 S. W. 675, 28 Ky. Law Rep. 675, the court cited with approval the following extract from Cooley on Torts:

"When one expressly or by invitation invites others to come upon its premises, whether for business or any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit."  White v. Cincinnati, etc., Railway Company, 89 Ky. 478, 12 S. W. 936, 7 L. R. A. 44, was an action by the employe of a shipper of stock who was injured by a defective stock shute while engaged in loading

stock, and, in holding that he had a good cause of action, the court said:

"The rule is well settled by a uniform current of decisions so numerous that citation is unnecessary that a railroad must keep its platform and approaches to which the public do or will naturally resort in doing business with it in a safe condition for such use. * * * The appellant had a right to be where he was and engaged as he was, when he was injured. The company had invited his presence by holding itself out as a carrier of stock. It had impliedly said to the public, 'the platform is safe for the purpose intended, if reasonable care can be exercised in its use.' * * * In this case the company had provided but the one chute and the one apron for the shipment of stock at the station. It was inviting patronage in this way by the public, although it knew the means provided for the purpose were unsafe."

A case very much in point is Sheltrawn v. Michigan Central Railroad Co., 128 Mich. 669, 87 N. W. 893. In that case the railroad company had placed a number of flat cars on a switch for the purpose of being loaded with logs. Sheltrawn, who was engaged in loading the logs, as an employe of the owner of the logs, was injured by reason of the cars being supplied with defective or unsafe brakes. It is true the petition charged that the railroad company knew the use to which the cars would be put, but this does not seem to have been a material issue in the case; the court proceeding upon the theory that it was the duty of the railroad company to furnish cars in a reasonably safe condition for the use intended. In considering the case the court said:

"It does not appear to be questioned that the relation of the defendant to this operation was such as

that it owed a duty of reasonable care to the plaintiff, as to which question, see Roddy v. Missouri Pacific R. Co., 104 Mo. 234, 15 S. W. 1112, 12 L. R. A. 746, 24 Am. St. Rep. 333.''

Risque v. Chesapeake & Ohio Railway Co., 104 Va. 476, 51 S. E. 730, relied on by counsel for appellant, we do not regard as applicable to the case we are considering. In that case Risque, who was an employe of the Alleghany Ore & Iron Company, was injured in a collision between an engine of the ore and iron company and a passenger train of the Chesapeake & Ohio Railway Company. It seems that the collision was caused by the fact that the railroad company furnished the iron and ore company with cars without brakes to be used by the latter company in its yards. In the course of the opinion the court said: ''The declaration shows that the cars were delivered by the railway company to the ore and iron company on the side track to be moved and either unloaded of freight belonging to the ore and iron company, or loaded with the product of the company. If these cars were without brakes, or equipped with unsound brakes, it was the duty of the ore and iron company to ascertain the fact by inspection and either remedy the defect or decline to use the cars. No relation of employer and employe existed between the defendant company and plaintiff's intestate; and, if he suffered any injury by reason of the cars in question being without brakes or equipped with unsound brakes, the liability, if any, would rest upon his master, the Alleghany Ore & Iron Company, for failing to make proper inspection, and not upon the railway company.''

It will thus be seen that the defective cars that caused the injury to Risque had been turned over to

the ore and iron company by the railway company to be used by the ore and iron company in its business, and they were being so used by it at the time of the injury, and were under the control and management of the ore and iron company. When this company accepted the cars from the railroad company, it took them in the condition they were delivered to it, and thereupon assumed the duty of protecting its employes from the injury on account of the defective or dangerous condition of the cars. This idea is well illustrated in Louisville & Nashville R. R. Co. v. Williams, 95 Ky. 199, 24 S. W. 1, 15 Ky. Law Rep. 548, 44 Am. St. Rep. 214, where the court said: "When one company receives cars of another company on its line of road for transportation, it is the duty of the company taking them to make careful superficial inspection of their condition such as an ordinarily prudent man engaged in such business would make for the protection and safety of the employes required to handle the car; and, when such defects are patent and an injury occurs to the employes by reason of the defect that is unknown to the party injured, the company is responsible."

To the same effect is L. & N. R. R. Co. v. Veach, 46 S. W. 493, 20 Ky. Law Rep. 403. Roddy v. Missouri Pacific R. Co., 104 Mo. 234, 15 S. W. 1112, 12 L. R. A. 746, 24 Am. St. Rep. 333, is also relied on by counsel for the appellant, but a careful reading of the case shows that it is not in conflict with the views we have expressed. Roddy was an employe of Pickle, who owned and operated a stone quarry. The railroad company furnished cars to the quarry to be loaded with stone. Roddy was injured by the failure of the railroad company to have the cars furnished the

quarry people equipped with brakes, and in an action against the railroad company for its failure to furnish cars provided with suitable brakes Roddy recovered damages. In considering the case the court, after stating that there was no contractual relation between Roddy and the railroad company, nor the relation of master and servant, said:

"What, then was the true relation between these parties? And what, if any, duty did it owe to plaintiff Roddy as the employe of Pickle? Defendant was engaged in the general business of a common carrier. It operated a railroad between St. Louis and Kansas City. Pickle was the owner of large and valuable stone quarries situated some distance from the defendant's road. * * * It thus became a matter of mutual interest and profit to defendant and Pickle to provide means for the transportation of this merchandise from the quarry to points at which it could be sold. A contract was entered into between them, by which defendant built a branch or spur road from its line to the quarries, and also tracks from this spur into the quarries. These were paid for by Pickle. In order to facilitate the transportation of stone, which was beneficial to both parties, it was agreed that defendant should, when cars were needed, place them on the quarry tracks or conveniently near to them and that Pickle should move them when needed into position for loading, and, when loaded, defendant should take them out and transport them to their destination. Plaintiff was employed by Pickle, and a part of his duties consisted in moving and handling these cars. * * * Under this evidence, it is clear that what was to be done by the respective parties under the contract was for their mutual profit, and each was a

contractor with the other to perform a particular part of the work necessary to carry out the common purpose. * * * We think each of these contracting parties owed to the other and his employes the duty of properly discharging his part of the joint undertaking in respect to any matter exclusively devolving upon him. Pickle had nothing to do with selecting or providing the cars. That duty was intrusted entirely to defendant. They were intended for the use of Pickle and his servants in discharging his part of the contract, and we think the objection rested upon defendant to use ordinary care to provide such as would be reasonably safe for such use. * * * While the relation of master and servant did not exist between these parties, defendant owed to plaintiff the observance of reasonable care in the selection of its cars for his use, which is the same degree of care the master is required to observe in providing his servant with the instrumentalities for carrying on its business."

We have reached the conclusion that under the facts stated the railroad company owed a duty to the extract company and its employes to furnish the car in a reasonably safe condition to be unloaded and that under the evidence it failed to perform this duty.

The point is further made that Freppon was guilty of contributory negligence sufficient to defeat a recovery. But the facts do not authorize this assumption. There is no evidence that he knew or had reasonable grounds to believe that the car door would fall if he knocked the pin out, or that he failed to exercise ordinary care for his own safety. The question of whether or not he was guilty of contributory negligence was fairly submitted to the jury in an in-

struction telling them, in substance, that if they believed from the evidence that the plaintiff failed to use ordinary care in unloading the car, and was careless and negligent in so unloading the same, and that but for his own carelessness and negligence the accident and injury would not have occurred, they should find for the defendant.

It is further urged that the verdict is excessive, but the evidence does not warrant us in so holding. The injuries received by Freppon were very serious and painful, and the only doctor who testified in the case said that, although his disability to labor was not totally destroyed, it was permanently impaired, and that his injured limb would never be as good as it was before the injury. Under these circumstances the verdict is not in our opinion excessive.

Perceiving no substantial reason why the verdict should be interfered with the judgment of the lower court is affirmed.